UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ROBERT ANDREW WHITT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 17-CV-0632-CVE-CDL |
| | ) | |
| JIM FARRIS, Warden,[1] | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

This matter comes before the Court on a petition for writ of habeas corpus filed pursuant to

28 U.S.C. § 2254.  Petitioner Robert Andrew Whitt is a prisoner proceeding pro se.  He is currently

in the custody of the Oklahoma Department of Corrections (ODOC) and confined in the Oklahoma

State Penitentiary (OSP), in McAlester, Oklahoma.  He challenges his conviction and sentence for

first degree malice murder in Tulsa County District Court (Case No. CF-2013-112).  The Oklahoma

Criminal Court of Appeals (OCCA) affirmed on December 14, 2016.  Dkt. # 6-1.  For the reasons

discussed below, the petition is denied.

Whitt filed the instant petition for writ of habeas corpus (Dkt. # 1) on November 20, 2017,

challenging his conviction and sentence as in violation of federal law on the following grounds:

I.      Insufficient evidence supported his conviction for first-degree murder;

II.     The trial court improperly coerced the jury's verdict;

---

[1]      Petitioner is currently confined at the Oklahoma State Penitentiary (OSP).  Pursuant to FED.
R. CIV. P. 25(d), the Court therefore substitutes the OSP's current warden, Jim Farris, in
place of Joe Allbaugh as party respondent.  The Clerk of Court shall note this substitution
on the record.

III.     The prosecutor acted improperly;

IV.     Whitt received ineffective assistance of counsel;

V.      Extraneous evidence was injected into jury deliberations; and

VI.     The cumulative effect of all the errors at trial violated Whitt's constitutional

       rights.

Respondent filed a response (Dkt. # 6) in opposition to the petition, arguing that each claim should be denied on its merits.

## FACTUAL BACKGROUND

The following facts were adduced at trial.  On October 11, 2012, Amber Ayers saw, and communicated via text message with, her former boyfriend, Whitt.  Ayers testified that the two discussed, among other things, Whitt purchasing Adderall from Ayers.

That evening, Ayers; her boyfriend Mark Coble; Tim Reed, Coble's co-worker; and Reed's girlfriend, Michelle Younger, met at Coble's house at approximately 6:30 p.m.  The four sat on Coble's porch and drank beer.  Reed testified that he noticed tension between Ayers and Coble.  For part of that time, Ayers was inside the house, but her mobile phone was on the porch.  Reed testified that alerts and calls came to Ayers's phone.  Coble answered one of the calls.  Younger's testimony corroborated Reed's observation of tension between Coble and Ayers.  After about an hour, Reed and Younger decided to leave.  Reed testified that Coble asked Reed to drive him to the Wal-Mart store in Glenpool, Oklahoma.  Younger testified that Coble first asked Ayers to drive Coble to the Wal-Mart, but Ayers refused.  Coble left with Reed and Younger.  They stopped at Reed's house, dropped off Younger, and switched cars.

2

Ayers testified that she remembered Coble talking to Whitt on her phone.  When the call ended, Coble went to the shed and retrieved a pool cue.  Ayers asked Coble what he was doing.  Coble stated he was going to play pool with some buddies and asked Ayers to give him a ride.  She refused.  Coble left with Reed and Younger.  Reed testified that Coble did not have a gun.  Ayers testified Coble did not leave the house with the pool cue; he left it in the kitchen.

Reed drove Coble to the Glenpool Wal-Mart store.  Coble directed Reed to drive around the store and stop behind a small blue car carrying three individuals.  Both cars proceeded out of the parking lot to a side street behind the store.  Coble directed Reed to stop the car.  Coble got out to speak to the individuals in the blue car, now parked behind Reed's car.  Reed remained in the vehicle.  After a few minutes, Reed looked into the rearview mirror and saw Coble and Whitt engaged in a fist fight.  Reed saw two other men emerge from the blue car.  Reed then exited his vehicle and ran to the back of the blue car, where the other men were standing.  They knocked Reed to the ground and began beating him.  After a few seconds, Reed heard gunshots.  Reed and the two other men stopped fighting at the sound of the gunshots.  Reed testified that he moved behind the blue car to distance himself from the shooter.  Reed saw Coble running away from the shooter and saw the shooter, who was standing, shoot Coble in the back.  Coble fell to the ground.  The shooter turned around and aimed the gun at Reed across the top of the blue car.  Reed identified Whitt as the shooter.  Reed testified that he got in his car and drove it to where Coble was lying.  Reed dragged Coble into the passenger seat of the car and drove home.  On the way, he called 911.  Younger testified that when Reed arrived at home, Coble was not breathing.  She attempted to perform CPR on Coble, but it was ineffective; he was already dead.

The two other men in the blue car with Whitt, Dylan Whelpley and Britt Sund, both testified at the trial. Whelpley testified that Whitt asked him to drive him to the Wal-Mart in Glenpool to purchase Adderall for the three of them. Whelpley testified that when they arrived at the Wal-Mart, they followed the other car to a side street behind the store. The cars stopped and Coble exited the passenger side of Reed's car. Whitt stepped out of the vehicle and Coble struck him, knocking him to the ground, and kicked him repeatedly. Whelpley exited the vehicle. Simultaneously, Reed exited his vehicle. Whelpley and Reed met behind the blue car and began to fight. Sund joined. Within approximately 30 seconds, Whelpley heard gunshots. Whelpley testified that he immediately returned to his vehicle. He did not see the gun and did not know who fired the shots. Whitt and Sund returned to the car and the trio left the scene.

Sund testified that Whitt is his cousin. He testified that he, Whitt, and Sund went to the Glenpool Wal-Mart to purchase Adderall. Sund testified that he brought a gun (a hi-point nine millimeter) with him. He gave it to Whitt in the car before they left for Wal-Mart. Whitt placed the gun "behind his belt." Sund testified that Whelpley also knew about the gun. After the cars had stopped on the side street behind the store, Sund testified that Coble approached the passenger side of the car. Whitt stepped out of the car, and Coble starting hitting him. Sund and Whelpley exited the car and began fighting with Reed at the back of the car. Sund heard his gun hit the ground, then he heard gunshots. At that time Sund believed Whitt had the gun. He then saw Whitt shooting at Coble.

Whitt testified in his own defense. He stated that Amber Ayers contacted him on October 11, 2012. She asked him if he knew anyone that wanted to buy Adderall. Ayers met Whitt at his father's house at 11:30 a.m. or 12:00 p.m. The two talked, smoked pot, and caught up. Whitt

4

recalled that Ayers talked about Coble.  She stated she was in love with him and had moved in with him.  She also stated that he had been to prison, smoked methamphetamine, and she suspected he sometimes shot up methamphetamine.  She told Whitt that Coble "scared her a little bit."  Ayers left after about an hour.  Whitt understood that he would call Ayers later that day to make arrangements to purchase the Adderall.

Whitt testified that Britt Sund was interested in purchasing the Adderall.  Whitt called Ayers's phone; Coble picked up the call.  Whitt and Coble discussed the sale of Adderall.  Whitt agreed to drive to Glenpool.  Whitt, Sund, and Whelpley left in Whelpley's small blue car.  Whelpley was driving.  On the way, Coble called Whitt again from Ayers's phone to confirm the meeting. Whitt testified they did not discuss fighting; Whitt testified he did not anticipate that a fight would occur.

When Whitt arrived at the Glenpool Wal-Mart store, he called Ayers's phone to tell Coble they had arrived.  They arranged to meet on a side street behind the store.  Reed and Coble stopped at a stop sign.  Whitt, Whelpley, and Sund stopped behind Reed and Coble.  Whitt testified that he saw Coble exit Reed's vehicle.  Whitt got out of Whelpley's car as Coble approached.  Coble hit Whitt in the mouth with a gun, knocking Whitt to the ground.  Coble climbed on top of Whitt, hitting and kicking him.  When Coble briefly turned his head, Whitt attempted to wrestle the gun away from Coble.  The gun fell to the ground.  Both Coble and Whitt attempted to retrieve it.  Whitt was able to grab the gun, and it discharged.  Whitt testified that the next thing he remembered, he was getting back into the car.  Whitt testified that he could not see Coble because he was blinded by the flash of the gun.  He did not recall how many shots he fired.  Whitt denied receiving a gun from Sund.  Whitt

5

testified that he was lying on the ground on his back when he fired at Coble. He did not recall Coble's distance or posture.

Whitt testified as to his thought process during the incident. Whitt testified that he believed that he would never see his mom or dad again. Whitt stated that when Coble had control of the gun he thought "I've got to get it before he shoots me. I've got to get it, because I'm going to die if I don't." Whitt testified that they left the scene immediately because he was scared and Sund kept telling him to get in the car. On cross-examination, Whitt testified that he was injured in the incident. He had "a busted lip on the inside" and his "head was all swollen." He testified that on the return drive, he threw the gun over a bridge.

Dr. Eric Pfeifer, a medical examiner who works for the state, conducted an autopsy on Mark Coble's body. Dr. Pfeifer testified that Coble suffered three gunshot wounds: one to the front side of his right thigh, which only grazed him; one that entered the back left hip and lodged in his intestines; and one that entered his back and exited his chest. The third was the fatal shot. There was no evidence of soot or stippling around the wounds. Dr. Pfeifer thus hypothesized that the shooter was more than two feet away from Coble when he was shot. Both attorneys attempted to elicit testimony from Dr. Pfeifer as to whether the shooter and victim were sitting, standing, or crouching. Dr. Pfeifer testified that he could not make those determinations based on the autopsy, but he clarified that the hip and back wounds indicated the bullets entered the victim's back.

Agent Marty Wilson of the Oklahoma State Bureau of Investigation (OSBI) testified regarding his interviews with Reed, Younger, Ayers, and Whitt. He testified that he observed Whitt for the first time approximately 12 hours after the crime. At that time he did not observe any

injuries, kick marks, bruises, or scratches on Whitt's head and face.  He observed no injuries consistent with Whitt's claims that Coble beat and kicked him repeatedly.[2]

## PROCEDURAL BACKGROUND

A jury in Tulsa County District Court found Whitt guilty of first degree murder, in violation of OKLA. STAT. tit. 21, § 701.7 (2012).  On May 28, 2015, the trial judge sentenced Whitt to life in prison with the possibility of parole.  Dkt. # 7-15, at 169-70.  With assistance of counsel, Whitt filed a direct appeal to the OCCA, raising the following errors:

I.      The State's evidence was insufficient to prove all the elements of first-degree murder;

II.     No evidence supported the testimony of accomplice Britt Sund regarding who brought the gun to the scene of the crime;

III.    The conviction and sentence were the result of a coerced verdict;

IV.     Prosecutorial misconduct denied Whitt his right to a fair trial;

V.      Whitt was denied a fair trial because the trial court did not identify Britt Sund as an accomplice or instruct the jury that Mr. Sund was an accomplice as a matter of law;

VI.     The trial court failed to provide a complete record of the proceedings;

VII.    Whitt received ineffective assistance of counsel;

VIII.   Extraneous evidence not admitted at trial was injected into jury deliberations in violation of Whitt's constitutional rights; and

---

[2]     These facts are summarized from the parts of the transcript submitted with respondent's brief in opposition to the petition.  Dkt. # 6-5.  Additional relevant facts will be discussed infra in the analysis and discussion of the enumerated claims.

IX.     The cumulative effect of all errors denied Whitt a fair trial.

Dkt. # 6-2.

In addition to his appellate brief, Whitt filed in the OCCA a "Notice of Extra-Record Evidence Supporting Propositions VII and VIII of Brief of Appellant and/or Alternatively Application for Evidentiary Hearing on Sixth Amendment Claims," in which he requested the OCCA review, pursuant to Rule 3.11(A) and (B)(3)(b)(1), <u>Rules of the Oklahoma Court of Criminal Appeals</u>, Title 22, Ch. 18, App. (2016), evidence that was not part of the trial record.  To support his claims of ineffective assistance of counsel, Whitt sought to introduce evidence obtained by the OSBI during their investigation of the crime.  This evidence included text messages between Whitt and Ayers.  Whitt also sought to introduce photographs of his face taken by his sister, Cynthis Grubbs, the day after the shooting, which he purported show mouth, face, and head injuries.  He also sought to introduce an affidavit from Grubbs describing how Whitt's counsel chose not to submit the photos she took because they were date stamped the day before the shooting, and an affidavit from Whitt's father that he observed Whitt's injuries.  To support his claim of improper extraneous evidence in the jury room, Whitt sought to introduce statements of jurors given to the OSBI during their investigation and an affidavit from one juror regarding what occurred during jury deliberations. Dkt. # 6-3.

The OCCA denied all of Whitt's propositions on appeal and denied his application to supplement the record under both subsections of Rule 3.11, finding that the non-record material submitted by Whitt (a) did not meet the clear and convincing evidence standard to demonstrate there would have been a different outcome had counsel introduced the non-record evidence at trial, and

(b) the juror statements and affidavit he sought to introduce were barred by OKLA. STAT. tit. 12,

§ 2606(B) (2016), which bars jurors from testifying to

> any matter or statement occurring during the course of the jury's deliberations or as
> to the effect of anything upon the juror's mind or another juror's mind or emotions
> as influencing the juror to assent to or dissent from the verdict or indictment or
> concerning the juror's mental processes during deliberations.

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254, federal district courts have jurisdiction to hear claims from state

prisoners that their convictions were obtained in violation of the United States Constitution.  A

prisoner must "exhaust" available state court remedies by "fairly presenting" each claim raised in

a petition for writ of habeas corpus to the courts in the state of conviction.  State courts are first

granted the opportunity to "correct alleged violations" of constitutional magnitude before those

claims may be heard in federal court.  Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam).

The purpose of habeas review is to "guard against extreme malfunctions in the state criminal justice

systems" not as "a substitute for ordinary error correction" through appeal in state court.  Harrington

v. Richter, 562 U.S. 86, 102 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332, n. 5 (1979)

(Stevens, J., concurring in judgment)).

If a prisoner has fully exhausted each claim in state court, the petition for writ of habeas

corpus will be granted only if the state court's adjudication of the claim–

> (1)     resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A habeas court will first analyze whether federal law "was clearly established by the Supreme Court at the time of the state court judgment." Byrd v. Workman, 645 F.3d 1159, 1165 (10th Cir. 2011). A state court's judgment is "contrary to" federal law where "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." Id. (citing Gipson v. Jordan, 376 F.3d 1193, 1196 (10th Cir. 2004)). An unreasonable application of federal law occurs where the state court identifies the proper controlling legal principle but "unreasonably applies" the law to the facts of the defendant's case. Id.

## DISCUSSION AND ANALYSIS

As an initial matter, the Court must identify the evidence properly before it in reviewing this petition for writ of habeas corpus. In the petition, Whitt refers to and uses evidence that was not part of the state-court record to support his arguments. Specifically, he refers to evidence that the OCCA barred under Rule 3.11(A) and (B)(3)(b)(1), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2016). In fact, Whitt attached to his petition the entirety of the "Notice of Extra-Record Evidence Supporting Propositions VII and VIII of Brief of Appellant and/or Alternatively Application for Evidentiary Hearing on Sixth Amendment Claims," plus the attachments filed in the OCCA.

In Cullen v. Pinholster, the Supreme Court clarified that a district court's review of constitutional claims on habeas is limited to the state court record. 563 U.S. 170, 181 (2011). Thus a federal habeas court examines only "the state-court decision at the time it was made." Id. at 182. "[E]vidence later introduced in federal court is irrelevant to § 2254(d)(1) review." Id. at 184. See also Eaton v. Pacheco, 931 F.3d 1009, 1019 (10th Cir. 2019). On the basis of the clearly-established

10

Supreme Court precedent, this Court will not consider any of the evidence attached to Whitt's petition as it was not part of the state court record upon which the OCCA ruled.

**Ground one:  Sufficient evidence supported Whitt's conviction for first degree murder.**

In ground one of the petition, Whitt argues that the prosecution did not present evidence sufficient to support a verdict of first degree murder, but argues, on the contrary, that sufficient evidence did support his claim that he acted in self-defense.  He points specifically to evidence that demonstrated he did not engage in mutual combat, and the absence of evidence that he brought a gun to the scene.

On habeas review, a petitioner is entitled to relief for insufficient evidence if "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979).  A habeas court should not make its determination based on its own evaluation of the evidence, but whether it finds that, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319.  This inquiry is an objective one, meaning a federal court sitting in habeas may overturn a state court decision rejecting a challenge to the sufficiency of the evidence only where the state court decision was "objectively unreasonable," Cavazos v. Smith, 565 U.S. 1, 2 (2011) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)), or "so insupportable as to fall below the threshold of bare rationality," Coleman v. Johnson, 566 U.S. 650, 656 (2012).

The Jackson standard "respects the jury's responsibility to weigh the evidence and to draw reasonable inferences from the testimony presented at trial."  Dockins v. Hines, 374 F.3d 935, 939 (10th Cir. 2004) (quoting Jackson, 443 U.S. at 319).  Courts give great deference to the finder(s) of

11

fact "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. When a set of facts supports "conflicting inferences," a habeas court is directed to presume "that the trier of fact resolved any such conflict in favor of the prosecution and must defer to that resolution." Cavazos, 565 U.S. at 7 (quoting Jackson, 443 U.S. at 326). In addition to the deference due the trier of fact, the high court notes that the "nature" of a constitutional sufficiency review by a habeas court is "sharply limited." Wright v. West, 505 U.S. 277, 296 (1992). A habeas petitioner claiming insufficient evidence "faces a high hurdle" under the Jackson standard. Patton v. Mullin, 425 F.3d 788, 796 (10th Cir. 2005). "Where a habeas petitioner's sufficiency of the evidence challenge has already been decided in state court, [the habeas court] employ[s] a more limited review." Valdez v. Ward, 219 F.3d 1222, 1237 (10th Cir. 2000).

In Oklahoma, the elements of murder in the first degree are: (1) the death of a human; (2) the death was unlawful; (3) the death was caused by the defendant; and (4) the death was caused with malice aforethought. Dkt. # 6-6, at 3 (jury instruction). Use of deadly force is justifiable when the person "reasonably believes such force is necessary to prevent death or great bodily harm to himself . . . . OKLA. STAT. tit. 21 § 733(A)(2) (2014).

The OCCA identified the proper standard for analysis of insufficiency of evidence claims, and held, "[T]aking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Whitt acted neither in self-defense nor in the heat of passion when he shot the victim." The OCCA determined that jurors could reasonably have found that (a) Whitt engaged in mutual combat with the victim and came to the fight armed, and (b) Whitt

was armed and intentionally shot the victim.  Both findings would preclude self-defense.  Dkt. # 6-1, at 3.

In Whitt's case, the jury was instructed on first-degree malice murder, manslaughter, and self-defense.  The jury received instructions that self-defense is not available to the aggressor in an altercation, or to one who enters into mutual combat.  Dkt. # 6-6, at 3-12.  Evidence was presented that supports a rational inference of first-degree murder.  Britt Sund testified that he gave Whitt a gun in the car before the encounter at Wal-Mart.  Thus, the jury could reasonably have credited Sund's testimony that Whitt was armed over Whitt's testimony that he was not.  Whitt testified that Amber Ayers told him Coble was an ex-convict, frequent methamphetamine user, and sometimes "scared her a little bit."  The jury could have determined Ayers's statements informed Whitt's intentions as he left for Wal-Mart that night.  Further, the jury could reasonably have concluded that "fighting words" were exchanged on Ayers's phone between Coble and Whitt.

Forensic evidence showed that two of the gunshot wounds entered Coble in the back.  Thus, jurors could reasonably have found that Coble was running away from Whitt at the time Whitt fired the fatal shots.  There were inconsistencies in the evidence of the struggle for the gun, but no evidence was presented that Coble had a weapon of any kind.  Whitt admitted to gaining control over the gun, shooting Coble, and later throwing the gun out the car window over a bridge.  Evidence was presented that after the first phone call, between Coble and Whitt on Ayers's phone, Coble grabbed a pool cue, but did not leave with it.  It was reasonable for the jury to conclude that Coble was not armed.

Whether or not the evidence as presented by Whitt could also support manslaughter or self-defense is not the question before this Court on habeas review.  This Court's review is limited to a

determination whether, based on the evidence presented at the trial, the jury's verdict was objectively reasonable. Where "conflicting inferences" exist, the Court must presume "that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." Cavazos, 565 U.S. at 7 (quoting Jackson, 443 U.S. at 326). Even if sufficient evidence demonstrated Whitt acted in self-defense, it would not exclude a jury from rejecting the claim when sufficient evidence existed to prove every element of first-degree murder.

On appeal, and in his petition for writ of habeas corpus, Whitt attempted to introduce evidence that he had cuts, scratches, and bruises; in fact this is the basis of one of his claims of ineffective assistance of counsel. But his attorney did not introduce those pictures, and they were not part of the record or exhibits at trial. The OCCA did not consider them; they were not part of the trial record. Nor will the Court consider them. On the contrary, OSBI Agent Marty Wilson testified that he observed no cuts, scratches, or bruises on Whitt's face or neck roughly 12 hours after the incident.

Therefore, based on the foregoing, the Court cannot say the OCCA's determination that sufficient evidence supported the jury's verdict of first-degree murder was "contrary to" or "an unreasonable application of" controlling Supreme Court precedent. Accordingly, Whitt's ground one is denied.

**Ground two:  The jury's verdict was not coerced.**

In ground two, Whitt claims that irregularities surrounding the Court's issuance of a jury instruction pursuant to Allen v. United States, 164 U.S. 492 (1896), denied him his constitutional rights. He contends that the instruction was given too late. It was given in writing and not in person. He claims that the time between the Allen charge and the verdict was too short. Jurors were hungry

14

and tired, and the court did not buy them dinner.  Further, attorneys for both Whitt and the state were

consulted by phone, but not in person, after each juror note.  Taking all of these things together,

Whitt argues that the jury was coerced into a verdict of first degree murder.  Whitt also urges that

he is entitled to de novo habeas review because the OCCA did not address the issue on appeal.[3]

At 10:07 p.m. on January 16, 2015, the jury sent a note to the trial judge stating:

Your Honor,

We are deadlocked.

@ 6 for murder one, and 6 for manslaughter.

We have been deliberating intensely for over five and a half hours and no one is
budging.

Dkt. # 7-14, at 107.

In response, the judge gave the following Allen instruction in writing and sent it to the jury:

Instruction No. 51

This case has taken approximately four (4) days of trial time.  You have deliberated
for approximately seven (7) hours.  You report to me that you are experiencing
difficulty in arriving at a verdict.

This is an important case and a serious matter to all concerned.  You are the
exclusive judges of the facts; the court is the judge of the law.  Now I most
respectfully and earnestly request of you that you continue your deliberations.
Further open and frank discussion of the evidence and law submitted to you in this
case may aid you in arriving at a verdict.

This does not mean that those favoring any particular position should surrender their
honest convictions as to the weight or effect of any evidence solely because of the
opinion of other jurors or because of the importance of arriving at a decision.  No

---

[3]   Juror Jetton averred in an affidavit that he felt forced to change his vote from manslaughter
to murder after the Allen instruction.  This affidavit was not part of the state-court record.
Whitt's request that it be considered was denied.  Under Pinholster, supra, this evidence is
irrelevant to this Court's 28 U.S.C. § 2254(d)(1) review.

juror should ever agree to a verdict that is contrary to the law in the court's instructions, nor find a fact or concur in a verdict which in good conscience he or she believes to be untrue.

This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in the spirit of fairness and candor.  If at all possible, you should resolve any differences and come to a common conclusion, that this case may be completed.  Each juror should respect the opinion of his or her fellow jurors, as he or she would have them respect his or hers, in an earnest and diligent effort to arrive at a just verdict under the law and the evidence.

You may be as leisurely in your deliberations as the case may require and take all the time necessary.  The giving of this instruction at this time in no way means that it is more important than any other instruction.  On the contrary, you should consider this instruction together with and as part of the instructions which I previously gave you.

In stating the foregoing, I again repeat:  you are the judges of the facts; the court is the judge of the law.  In making all statements made to you I have not nor do I now, express or intimate, nor indicate, in any way the conclusions to be reached by you in this case, nor do I intend in any way or manner to coerce a verdict, nor directly or indirectly to force a verdict in this case.  I only ask that you diligently and earnestly under your oaths continue your deliberations.

Dkt. # 6-6, at 13.  The jury returned its verdict for murder in the first degree at approximately 11:30

p.m.  Dkt. # 7-7, at 95-96.

On direct appeal, the OCCA found no error in the <u>Allen</u> instruction and no abuse of

discretion by the trial court.  Doc. # 6-1, at 4-6.

Whitt complains that the trial court should not have given the <u>Allen</u> charge.  Giving this instruction, and the length of deliberations before it is given, are within the trial court's discretion.  <u>Gilbert v. State</u>, 1997 OK CR 71, ¶ 62, 951 P.2d 98, 115; <u>Ellis v. State</u>, 1990 OK CR 43, ¶ 8, 795 P.2d 107, 109.  Whitt argues that the instruction was improper given the time jurors had spent deliberating, and given their even split.  This Court has upheld a trial court's decision to give an <u>Allen</u> instruction after several hours of deliberation.  <u>Gilbert</u>, 1997 OK CR 71, ¶ 62, 951 P.2d at 115; <u>McCarty v. State</u>, 1995 OK CR 48, ¶ 51, 904 P.2d 110, 125; <u>Ellis</u>, 1990 OK CR 43, ¶ 8, 706 P.2d at 109.  We have upheld an <u>Allen</u> instruction where the record shows the jurors were equally divided.  <u>Gilbert</u>, 1997 OK CR 71, ¶ 58, 951 P.2d at 115.  As required, the trial court told jurors not to surrender their honest convictions or agree to a verdict they, in good conscience, believed to be untrue.  <u>Hooks v. State</u>, 2001 OK

16

CR 1, ¶ 26, 19 P.3d 294, 310, reversed in part, <u>Hooks v. Workman</u>, 606 F.3d 715 (10th Cir. 2010).  The trial court's decision was not an abuse of discretion.

Dkt. # 6-1, at 5-6.

As an initial matter, the Court rejects Whitt's argument that the OCCA did not address the <u>Allen</u> issue on appeal.  Clearly, as stated above, the OCCA directly discussed the <u>Allen</u> charge in its opinion and found no impropriety.

Use of a supplemental jury instruction encouraging a deadlocked jury to continue deliberating in an attempt to reach a unanimous verdict has long been upheld by the Supreme Court.  <u>See</u> <u>Allen v. United States</u>, 164 U.S. 492 (1896).  A proper <u>Allen</u> instruction "encourages unanimity (without infringement upon the conscientious views of each individual juror)" and urges jurors "to review and reconsider the evidence in the light of the views expressed by other jurors, in a manner evincing a conscientious search for truth rather than a dogged determination to have one's way in the outcome of the deliberative process."  <u>Gilbert v. Mullin</u>, 302 F.3d 1166, 1173 (10th Cir. 2002).

A court sitting in habeas review of an alleged "coercive" <u>Allen</u> charge is directed to consider the supplemental instruction "in its context and under all the circumstances."  <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 237 (1988) (quoting <u>Jenkins v. United States</u>, 380 U.S. 445, 446 (1965)).  Among the factors a court should consider are (1) the specific language of the <u>Allen</u> charge; (2) whether the <u>Allen</u> charge was given alone or with other instructions; (3) the timing of the instruction; and (4) the length of the jury's post-instruction deliberation.  <u>See</u> <u>Gilbert</u>, 302 F.3d at 1173-76 (citing <u>United States v. Arney</u>, 248 F.3d 984 (10th Cir. 2001)).

As to the language factor, the trial judge used a "modified" <u>Allen</u> charge, which is directed to all the jurors, rather than only those in the minority.  Courts have found modified <u>Allen</u>

17

instructions such as the one used here to be less coercive than those directed only to minority-view-holding jurors.  See Gilbert, 302 F.3d at 1174; Arney, 248 F.3d at 988.  Moreover, the instruction stated that the judge was not attempting to "coerce" a verdict.  This factor weighs against coercion.

The Allen instruction in this case was not given at the same time as the other jury instructions, but after the trial judge was informed that the jurors were deadlocked, six for murder, six for manslaughter.  Although courts have found pre-deadlock instructions to be less coercive than those given during deliberation, there is no per se rule against a supplemental Allen instruction.  Numerous courts have found non-coercive Allen charges given after notification of impasse.  See Gilbert, 302 F.3d at 1174; Arney, 248 F.3d at 989 (collecting cases).  This factor weighs neutral.

Whitt further challenges the timing of the instruction, noting that the jurors were tired and hungry, and the trial court had not provided them a meal.  While it is true that the trial court did not purchase juror meals, the court made accommodations for jurors to order food that was subsequently delivered to the deliberation room.  Moreover, the court had instructed the jury the day before that it was likely deliberations would go into the evening.  The court thus instructed the jurors to bring food or money to order food and to have their personal obligations and needs met for the next evening.  Dkt. # 6-5, at 129-30.  The timing factor weighs against coercion.

The jury deliberated for approximately an hour and twenty minutes after the court issued the Allen instruction.  Dkt. # 6-5, at 141.  While courts have recognized that a jury returning a verdict shortly after receiving an Allen charge could weigh in favor of coercion, hour-long post-Allen deliberations have been repeatedly upheld.  See Gilbert, at 1175; Arney, at 990.  This factor weighs against coercion.

18

Whitt's final argument as to the <u>Allen</u> charge is that the trial court should have given the <u>Allen</u> charge to the jury in person rather than in writing.  All things considered, this Court believes that an in-person charge would appear more coercive to jurors than one given in writing.  This weighs against coercion.

Looking at the totality of circumstances surrounding the <u>Allen</u> charge, this Court finds the OCCA's determination that the <u>Allen</u> charge was not coercive was neither "contrary to" or an "unreasonable application of" Supreme Court precedent.  Accordingly, Whitt's ground two is denied.

**Ground three:  Prosecutorial misconduct did not deny Whitt's constitutional rights.**

Whitt alleges that the prosecution acted improperly, denying him his right to a fair trial.  Specifically, he alleges that the prosecutor improperly (1) evoked sympathy for the victim; (2) re-enacted part of the crime in front of the jury; and (3) misstated the applicable law.

Improper prosecutorial comments rise to the level of a constitutional violation only when the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 642 (1974)).  In reviewing claims of improper remarks by a prosecutor, a court sitting in habeas is directed to look at the "totality of the circumstances" in which the comments were made, <u>Smallwood v. Gibson</u>, 191 F.3d 1257, 1276 (10th Cir. 1999), and to view the comments "within the context of the trial as a whole," <u>Duvall v. Reynolds</u>, 139 F.3d 768, 794 (10th Cir. 1998).

> To view the prosecutor's statements in context, we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution. . . .  Ultimately, we must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly.

Cummings v. Evans, 161 F.3d 610, 618 (10th Cir. 1998) (quoting Hopkinson v. Shillinger, 866 F.2d 1185, 1210 (10th Cir. 1989)).

A prosecutor is granted a "reasonable amount of latitude in drawing inferences from the evidence during closing summation." Duvall, 139 F.3d at 795. Even where improper comments are made, they take on constitutional dimension only when they are so egregious as to render the trial fundamentally unfair. United States v. Hernandez-Muniz, 170 F.3d 1007, 1012 (10th Cir. 1999); see also Hooper v. Mullin, 314 F.3d 1162, 1172 (10th Cir. 2002). "[I]nappropriate prosecutorial comments, standing alone, [do] not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." Matthews v. Workman, 577 F.3d 1175, 1186 (10th Cir. 2009) (quoting United States v. Young, 470 U.S. 1, 11 (1985)). Courts should not allow prosecutorial remarks that encourage a jury to allow sympathy for the victim to influence its decision. See Hanson v. Sherrod, 797 F.3d 810, 841 (10th Cir. 2015) (other citations omitted). "A prosecutor may comment on and draw reasonable inferences from evidence presented at trial." Thornburg v. Mullin, 422 F.3d 1113, 1131 (10th Cir. 2005) (quoting Hooper, 314 F.3d at 1172).

The OCCA reviewed the claims for plain error because Whitt's counsel did not object at trial. The OCCA determined:

> The prosecutor did not misstate the law by eliciting testimony and arguing that one who came armed to a fight was not acting in self-defense, and that his actions were relevant to the issue of intent for manslaughter. As we discuss in Proposition I, self-defense is in fact not available to a person who enters into conflict armed with a deadly weapon. Davis 2011 OK CR 29, ¶ 95, 268 P.3d at 114-15. This court has also held that the fact a person entered a conflict armed with a deadly weapon could be a factor in finding a defendant guilty of murder rather than manslaughter. Black v. State 2001 OK CR 5, ¶¶ 36-37, 21 P.3d 1047, 1063. The prosecutor did not invoke sympathy for the victim by eliciting irrelevant testimony, or by arguing that, though the victim's reputation had been called into dispute, jurors should not let sympathy or prejudice affect their verdict. Coddington v. State, 2006 OK CR 34, ¶

20

52, 142 P.3d 437, 451; <u>Taylor</u>, 2011 OK CR 8, ¶ 55, 248 P.3d at 379; <u>Roy v. State</u>, 2006 OK CR 47, ¶ 30, 152 P.3d 217, 227. The prosecutor's crime scene reenactments, which were narrated on the record and based both on Whitt's testimony and the State's evidence, were within permissible bounds. The Court disapproves of posed reenactments which illustrate hypothetical situations. <u>Harris v. State</u>, 2000 OK CR 20, ¶ 10, 13 P.3d 489, 493. However, crime scene demonstrations may be used if they are based on the evidence and not "theatrical demonstrations." <u>Welch v. State</u>, 1998 OK CR 54, ¶ 15, 968 P.2d 1231, 1241. Because the prosecutor tied the reenactments to specific testimony and evidence, they were not speculative. This proposition is denied.

Dkt. # 6-1, at 7-8.

As discussed in ground one, <u>supra</u>, the evidence adduced at trial supported the verdict of first-degree murder. Thus, the Court will look at the allegedly improper comments made by the prosecutor to determine whether they could have tipped the scales in favor of the prosecution. <u>See Cummings</u>, 161 F.3d at 618. Whitt claims first that the prosecution improperly elicited sympathy for the victim from witness testimony. The prosecution asked witness Donna Coble, the decedent's mother, whether she had any children. She replied, "I have Mark who is deceased and another son who has Down Syndrome." Dkt. # 6-5, at 3. In questioning Tim Reed, the prosecution asked where Mark Coble was that day. Reed responded, "Liberty Mounds Cemetery." <u>Id.</u> at 5. Both of these statements were responses to questions laying the foundation for the competency of witnesses Donna Coble and Tim Reed. The effect of Donna Coble's overanswer to the question posed to her to include that she had a son with Down Syndrome, is negligible. This fact alone would not reasonably tip the scales in favor of the prosecution. More importantly, neither of these comments were raised in argument later by the prosecutor. The answers of Coble and Reed were responsive to prosecutor questions. The questions were not designed to improperly elicit sympathy, nor were they inflammatory in such a way as to render the entire trial fundamentally unfair.

21

In closing arguments, the prosecutor made two statements to which Whitt objected. First, he stated "(a) man was not only shot several times, but his memory was dragged through the mud this week." Dkt. # 6-5, at 132. Second, he stated that the victim was "due a fair trial too." Id. at 133. These comments were made in the context of the prosecutor's larger argument encouraging the jury against allowing sympathy or prejudice to enter the jury's deliberations. The Court cannot see how these comments could have tipped the jury in favor of the prosecution. The OCCA's determination that these comments were not prejudicial was entirely reasonable.

As to Whitt's claim of improper reenactment of parts of the crime for the jury, this Court notes that these reenactments were undertaken by the prosecutor during the questioning of specific witnesses and involved asking that witness to approximate, with his body, where and how he was standing during the incident. The prosecution did not set up a theatrical reenactment of the crime. The movements of the witnesses and prosecutor were based entirely on the testimony just rendered. The reenactments were tied directly to the evidence and were enacted simultaneously with testimony. It was not an unreasonable determination that no prejudice resulted from the reenactments or rendered the trial unfair.

As to Whitt's claim that the prosecutor misstated the law, the OCCA found no error in the prosecutor's statement that self-defense is not available to one who brings a gun to a fight. A federal court sitting in habeas should not challenge a state-court's determination of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Finally, Whitt concedes that his attorney did not object to any of these alleged improprieties during the trial, which supports a finding that nothing appeared obviously improper at trial.

Taking these alleged improper statements together, the OCCA's determination that the specific statements cited did not rise to the level of prosecutorial misconduct was not contrary to or an unreasonable application of relevant federal law.  Accordingly, Whitt's ground three is denied.

**Ground four:  Whitt did not receive ineffective assistance of counsel.**

Whitt argues that his trial attorney was ineffective in (1) failing to object to prosecutorial misconduct and (2) failing to present "readily available evidence" of the text conversations between Whitt and Amber Ayers and photographs depicting his injuries taken the next day.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established a two-pronged standard for analyzing claims of ineffective assistance of counsel on habeas review.  First, the defendant must demonstrate his attorney's performance was deficient.  Second, the defendant must demonstrate the alleged deficient performance prejudiced his defense.  Id. at 687.  Under the first prong, a defendant must show her attorney's conduct fell below "an objective standard of reasonableness."  Id. at 688.  The Court presumes counsel's conduct falls within the acceptable range of reasonable professional assistance.  Id. at 689.  To overcome this presumption a defendant must show the alleged error could not be considered "sound trial strategy."  Id.

Even if a defendant demonstrates an objective attorney error, there is no constitutional violation unless he also shows he was prejudiced by the error.  See Strickland, 466 U.S. at 687.  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  The Strickland Court defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome."  Id.

23

The OCCA cited <u>Strickland</u> as the controlling law and analyzed Whitt's claims in accordance thereto. As to the specific errors Whitt alleged, the OCCA determined:

> We found in Proposition IV that Whitt was not prejudiced by the prosecutor's questions, actions and argument; Whitt thus cannot show he was prejudiced by trial counsel's failure to object to them.
>
> . . .
>
> Whitt also claims counsel failed to present available evidence to refute the State's theory that Whitt and Coble met at the Walmart for a fight, and to support Whitt's self-defense claim. Whitt relies wholly on the material offered in support of his Rule 3.11 motion. We do not consider that material, which is not in the record, in support of the substantive claims made in this proposition. As nothing in the record supports these claims, Whitt's claim of ineffective assistance of counsel is denied.

Dkt. # 6-1, at 10-11.

Whitt's claim that he received ineffective assistance of counsel because his attorney failed to object to the prosecutor's alleged improper conduct must fail because the Court has already determined, in ground three, <u>supra</u>, that those comments and statements did not rise to the level of a constitutional violation. To make out a claim that his trial counsel was ineffective Whitt would have to demonstrate objective attorney error. He did not do so on the stand-alone prosecutorial misconduct claim. Moreover, Whitt has not demonstrated any prejudice resulting from the alleged improper statements. As such, Whitt's claim of ineffective assistance of counsel in failing to object to the prosecutor's statement is denied.

As to Whitt's claim that his attorney should have introduced into evidence (a) photographs of Whitt's face that allegedly showed facial injuries consistent with his claims that Coble beat him, and (b) transcripts of text messages sent between Amber Ayers's and Whitt's mobile phones from earlier in the day of the shooting, the OCCA summarily dismissed the claim because the evidence on which is was based was not part of the trial record. Whitt attempted to add these pieces of

24

evidence in a Rule 3.11 motion. The OCCA rejected this claim because those pieces of evidence were not part of the record on appeal. The OCCA stated:

> In conjunction with this Claim, Whitt filed a Rule 3.11 Application for Evidentiary hearing on Sixth Amendment Claims. Rule 3.11, Rules of the Oklahoma Criminal Court of Appeals, Title 22, Ch. 18, App. (2016). There is a strong presumption of regularity in trial proceedings and counsel's conduct, and the application and affidavits must contain sufficient information to show by clear and convincing evidence the strong possibility that trial counsel was ineffective for failing to identify or use the evidence at issue. Rule 3.11(B)(3)(b)(i), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2016). We "thoroughly review and consider Appellant's application and affidavits along with other attached non-record evidence." Simpson v. State, 2010 OK CR ¶ 53, 230 P.3d 888, 905. The Rule 3.11 standard set out above is easier for a defendant to meet than the Strickland standard, as a defendant must only provide clear and convincing evidence that there is a strong possibility counsel was ineffective. Id. at ¶ 53, 230 P.3d at 905-06. A rule 3.11(B) motion must be accompanied by affidavits supporting the allegation of ineffective assistance of counsel. Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905. Whitt wholly fails to meet this standard. Whitt fails to show a strong possibility that if trial counsel had used the pictures or testimony, there would have been a different outcome. Whitt's Rule 3.11(B) application is denied.

Dkt. # 6-1, at 11-12.

A denial of an evidentiary hearing on the issue of ineffective assistance of counsel filed pursuant to 3.11 constitutes an adjudication on the merits, and is entitled to deference on habeas review. Lott v. Trammell, 705 F.3d 1167, 1213 (10th Cir. 2013); see also Harris v. Sharp, 941 F.3d 962, 976 (10th Cir. 2019). Such a denial is "not a procedural ruling" in which a court dismissed a claim because it was raised improperly, but "a substantive determination that the claim was unsupported by any evidence . . . ." Richie v. Workman, 599 F.3d 1131, 1142 (10th Cir. 2010) (quoting Matthews v. Workman, 557 F.3d 1175, 1182 (10th Cir. 2009)).

Whitt's arguments rely on evidence that was not part of the state record. Whitt's request to the OCCA that it consider that evidence was denied. This Court's review is limited to the state

record.  Whitt attempted to bring this evidence to this Court by attaching it to his petition for writ of habeas corpus.  Again, because it was not a part of the state record, the evidence attached to the petition is irrelevant to the Court's review.  Whitt has not demonstrated either prong of <u>Strickland</u>. He has not shown that counsel's failure to introduce the evidence at trial fell below an objective standard of reasonableness.  A court will "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  <u>Strickland</u>, 446 U.S. at 689.   Whitt would be required to "overcome the presumption that under the circumstances, the challenged action 'might be considered sound trial strategy.'"  <u>Id.</u> at 689 (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)).

Nor has Whitt shown prejudice (the second prong of <u>Strickland</u>) by counsel's failure to introduce the evidence.  He has not demonstrated that the outcome of the trial would have been different had his counsel submitted the evidence.  Whitt has failed to meet either <u>Strickland</u> prong. Thus the OCCA's decision, which found neither error nor prejudice, was not contrary to or an unreasonable application of applicable Supreme Court law.  Accordingly, Whitt's ground four is denied.

**<u>Ground five:  Extraneous evidence was not injected into jury deliberations.</u>**

Whitt contends that the jury conducted experiments and improperly attempted to reenact the crime scene during deliberations.  His claims are based upon OSBI interviews with jurors and the affidavit of one juror regarding what had occurred in the jury room.

During deliberations, the jury sent several notes to the judge.  Relevant here was note 4, part 1, in which the jury asked, "Can we use the measuring tape and pointer?"  The judge answered, "No.

26

You have been given all of the facts and law which are proper for you to consider." A handwritten note on the page states "7:15 called attorneys. No objection." Dkt. # 7-14, at 101.

The OCCA found that the only evidence in the record to support Whitt's extraneous-evidence claim was the juror note asking for a measuring tape and a pointer. The evidence he presented to support this claim were the statements of jurors, which the OCCA barred because they violated Oklahoma statute.

In Oklahoma, a juror is not allowed to testify regarding jury deliberations:

Upon an inquiry into the validity of a verdict or indictment, a juror shall not testify as to any matter or statement occurring during the course of the jury's deliberations or as to the effect of anything upon the juror's mind or another juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes during deliberations. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. An affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying shall not be received for these purposes.

OKLA. STAT. tit. 12, § 2606 (2016).

A jury verdict "must be based upon the evidence developed at the trial." Irvin v. Dowd, 366 U.S. 717, 722 (1961). Furthermore, that evidence must "come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." Turner v. Louisiana, 379 U.S. 466, 473 (1965). On habeas review, "a federal court may grant relief only where the alleged misconduct 'had substantial and injurious effect or influence in determining the jury's verdict.'" Vigil v. Zavaras, 298 F.3d 935, 940 (10th Cir. 2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). Regarding juries that have pantomimed or used props to reenact the crime or parts of the crime scene in the jury room, the

Tenth Circuit has held these acceptable so long as they are based on evidence adduced at trial. United States v. Abeyta, 27 F.3d 470, 477 (10th Cir. 1994). "There is simply no constitutional command preventing a jury from using common sense and ordinary and uninflammatory props to reenact a crime in the privacy of the jury room." Id.

Whitt's claim that the jury's attempts to recreate the crime in the jury room somehow involved extrinsic evidence must fail. Under applicable law, the jury was free to use common sense and ordinary knowledge they brought into the deliberation room to consider the facts and evidence adduced at trial. Whitt identifies no outside evidence, information, or objects that the jury used. He suggests that the request for the ruler and pointer demonstrated some type of misconduct. This assertion is contrary to applicable law. Even so, the trial judge denied the request, so his argument is moot. On the contrary, the jurors' request for a ruler and a pointer more likely demonstrated that they were engaged with the facts and evidence they learned in the trial. If the jury did reenact or attempt to act out part of the crime scene, it is of no consequence. Under applicable law, a jury is allowed to do so.

Based on the foregoing, this Court finds that the OCCA's denial of the extrinsic-evidence claim was neither contrary to nor an unreasonable application of applicable federal law. Accordingly, Whitt's ground five is denied.

**Ground six: The cumulative effect of the errors alleged did not deny Whitt due process.**

Whitt argues, finally, that the effect of the harmless errors, taken together, equal a constitutional violation. The Court disagrees. "A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Smith v. Duckworth, 824 F.3d

28

1233, 1255 (10th Cir. 2016) (quoting <u>Cargle v. Mullin</u>, 317 F.3d 1196, 1206 (10th Cir. 2003)). "[A]s the term 'cumulative' suggests, . . . we undertake a cumulative-error analysis only if there are at least two errors." <u>Lott v. Trammell</u>, 705 F.3d 1167, 1223 (10th Cir. 2013) (quoting <u>Hooks</u>, 689 F.3d at 1194-95.)

Whitt's final claim is easily dismissed.  On each count of the petition, the Court determined that the OCCA's conclusions were not contrary to or unreasonable applications of relevant federal law.  The Court determined that sufficient evidence supported the verdict, the trial court did not coerce the jury's verdict, the prosecutor did not act improperly, trial counsel provided effective assistance, and the jury did not rely on improper extrinsic evidence.  None of Whitt's claims has merit on habeas review.  Thus, there is no cumulative error.  <u>See</u> <u>United States v. Franklin-El</u>, 555 F.3d 1115, 1128 (10th Cir. 2009) ("The cumulative-error analysis applies when there are two or more actual errors.  It does not apply, however, to the cumulative effect of non-errors.") Accordingly, ground six of Whitt's petition for writ of habeas corpus is denied.

CONCLUSION

In summary, Whitt has not shown that he is in custody in violation of the Constitution.  The Court therefore denies the petition for writ of habeas corpus.  Further, because Whitt has not shown that reasonable jurists would debate this Court's assessment of his constitutional claims, the Court denies a certificate of appealability.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1.    The Clerk of Court shall note on the record the substitution of Jim Farris, Warden, in place of Joe Allbaugh as party respondent.

2.    The petition for writ of habeas corpus (Dkt. # 1) is **denied**.

3.      A certificate of appealability is **denied**.

4.       A separate judgment shall be entered in this matter.

**DATED** this 28th day of January, 2021.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE